The CITY OF HOUSTON, Appellant,

v.

Sam LEVINGSTON, D.V.M., Appellee.

No. 01–03–00678–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

July 27, 2006.

The Holman Law Firm, P.C., Houston, for Appellant.

Martin A. Shellist, Shellist * Lararz, LLP, Michael David Lore, The Lore Law Firm, Houston, for Appellee.

Panel consists of Justices TAFT, JENNINGS, and BLAND.

## OPINION ON REHEARING

TERRY JENNINGS, Justice.

We grant appellant's motion for rehearing, withdraw our opinion dated February 2, 2006, and substitute this opinion in its place.

In this Texas Whistleblower Act[1] lawsuit, appellant, the City of Houston ("the City"), challenges the trial court's judgment, rendered after a jury verdict, awarding appellee, Dr. Sam Levingston, $116,500 in past lost wages, $235,000 as the value of reinstatement to Levingston's former position, fringe benefits and seniority rights, and $250,000 in capped compensatory damages, plus attorneys' fees, pre- and post-judgment interest, and court costs.

In three of its seven issues, the City contends that there is no evidence to support the jury's findings that Levingston, in good faith, reported a violation of law to an appropriate law enforcement authority, that the termination of Levingston's employment was caused by the report, and the jury's award of mental-anguish damages. In its remaining issues, the City contends that the trial court erred in awarding Levingston the monetary value of reinstatement to his former position without subjecting that award to the applicable statutory damages cap; awarding Levingston prejudgment interest on his capped compensatory damages; applying a "multiplier" to its award of Levingston's

Cheryl G. Cash, Constance K. Acosta, Sr. Asst. City Attys., David W. Holman,

---

1. *See* TEX. GOV'T CODE ANN. §§ 554.001–.010 (Vernon 2004).

attorneys' fees; denying the City's request to include a separate question in the jury charge regarding the City's affirmative defense; and denying the City's pretrial motion to strike Levingston's untimely request for a jury trial.

We modify the trial court's judgment to provide for the award of prejudgment interest on the amount of $116,500 rather than on the amount of $365,500. We affirm the judgment of the trial court in all other respects.

## Factual and Procedural Background

Dr. Levingston served the City as a senior veterinarian in its Bureau of Animal Regulation and Care ("BARC"), a division of the City's Department of Health and Human Services, from September 8, 1992 until his employment was terminated on March 23, 2000. Prior to his termination, Levingston had over 40 years of experience as a licensed veterinarian.

BARC, previously known as "the City of Houston Rabies Control Facility," has the responsibility for the control of rabies within the City.[2] The record reveals, moreover, that "BARC has law enforcement responsibilities in animal-related issues within the City." The BARC facility intakes approximately 28,000 to 30,000 animals in a given year. Out of these animals, approximately 25,000 are euthanized by BARC, and another 120 to 140 animals are dead on arrival or die of natural or unexplained causes while in BARC's care.

At trial, Levingston testified that during his employment with BARC, he saw "a number of things" occurring at BARC's facility that "rose to the level of animal abuse." Among other problems, he noted that individual pens in the BARC kennel were too small and overcrowded and that this caused animals to fight over food. He also noted that when the air conditioners on BARC trucks did not work, animals would arrive at the BARC facility heated, exhausted, and sometimes dead.

Levingston stated that BARC kennel attendants, in a cruel and inhumane manner, held animals in a dip tank with their heads under water "to teach them a lesson." He saw BARC kennel attendants jerk dogs off of BARC trucks onto a concrete floor, which would "create painful breaks." Levingston also saw BARC kennel attendants pitch puppies "like a baseball from the truck to the holding pen, which had a concrete floor." He explained that when mother dogs were brought into the BARC facility, their puppies, due to a "faulty floor," would often get stuck down into a four inch drain. On one occasion, BARC kennel attendants washed three puppies down the sewer line. Levingston also stated that cats were sometimes "euthanized in burlap sacks by throwing them under the back wheels of a truck."[3] He also explained that BARC employees did not properly feed and water animals, that they would ration food for animals scheduled to be euthanized, and that "the attitude was, 'Well, they're only going to be here three days, so they'll either go home or they'll be euthanized, so why waste the food on them?'"

Levingston further testified that he reported these matters to the attention of John Nix, the Division Manager of BARC, from the time that Nix became Division Manager in September 1996 until May 21, 1999. He normally communicated his

**2.** Houston, Tex., Ordinances ch. 6, art. I, § 6–1(a).

**3.** Although Levingston did not see this happen, he did see, on at least six occasions, in the BARC freezer, burlap sacks containing animals "with crushed skull[s], bones, [and] legs."

complaints to Nix by periodically leaving Nix notes written on 5-inch by 8-inch index cards. Levingston would complete an index card when he "found the abuse," typically at the end of his workday between 4:00 and 7:00 p.m. He had to leave Nix written reports because Nix typically left the BARC facility at 2:00 p.m. on business days. Levingston explained that animal abuse at BARC grew worse after Nix became Division Manager because, unlike his predecessor, who "was in the kennel every single day," Nix was in the kennel only "twice a month" as he walked "through to pick up a city vehicle." Despite his complaints, Levingston "never saw a change" at BARC.

In May 1999, Levingston decided to handwrite a formal letter outlining his complaints to Nix because his complaints about animal abuse were being "ignored." Levingston was concerned that his written reports "probably had been thrown away without any action taken, so [he] wanted this letter typed and placed in [his] file and to show evidence of the inhumane treatment." When Levingston spoke with his direct supervisor, Dr. Adel Hanna, who was also a senior veterinarian at BARC, about Nix's failure to respond to his complaints, Hanna told him that "Nix was getting kind of irritated because [Levingston] was giving him so many cards and talking so much about the inhumane treatment of animals." On May 20, 1999, Levingston gave his handwritten letter, which was to be dated May 21, 1999, to the kennel's secretary.

In the letter, Levingston offered suggestions for improving the operation of the facility, proposed changes, and noted:

> The animals are treated inhumanely including—by improper restraints, a lack of water and sometimes food, and rough handling by uncaring employees—this

should be corrected before the SPCA or another humane organization finds out.

When asked why he made all of his reports to Nix at BARC and "not somewhere else," Levingston testified:

> It's against the law to treat the animals inhumanely. This is the authority for which the inhumane treatment should be reported to. And it's the law.

He explained that, as a BARC senior veterinarian, he in fact "did go out a few times to investigate animal abuse with a team from BARC."

Nix testified that although he did not recall discussing animal abuse at BARC with Levingston before receiving Levingston's May 20 letter, his recollection could be wrong. Nevertheless, in a "confidential" memorandum to Levingston dated June 1, 1999, Nix stated that he had reviewed Levingston's handwritten memorandum, which was delivered to him on May 24, 1999, and was "greatly disturbed" by Levingston's allegations. Nix further stated that he had "initiated an investigation of these allegations" and requested "specific detail in order to initiate appropriate action against parties who participate in such mistreatment."

Levingston then replied to Nix's memorandum in a June 3, 1999 handwritten letter, noting, among other things, that during his daily observation walks in the kennel, he saw mother dogs and cats with their young without food and water almost daily. He also noted that he had previously advised Nix "many times" of problems with the performance of the Kennel Master, Robert Trottie, who supervised the kennel attendants, and that he had been doing Trottie's job "for the last two years." Although Levingston never heard back from Nix in regard to his June 3 letter, Levingston continued to supply Nix with his written complaints about the care of animals in the kennel and the treatment of

specific animals. He did this until he received a September 1, 1999 letter from Dr. Margaret Kendrick, the Director of the City's Department of Health and Human Services, advising him that Nix had recommended that his employment be terminated.

In the letter, Kendrick notified Levingston that it was "alleged that [he] directly violated BARC's policy regarding negligence in the treatment of animals resulting in unwarranted suffering and death." Specifically, she cited "the deaths of a female Rottweiler from complications due to an uterine infection and hemorrhage on May 6, 1999 and a quarantined Great Dane on July 22, 1999." The letter noted that a meeting had been scheduled for later that month. Levingston testified that Hanna had received a similar letter and that they were "shocked and both ill at the same time" because the letters were unexpected. Nix had never disciplined or even spoken with Levingston about his treatment of either animal, and Levingston had received "strong" performance evaluations in regard to his service.

The record reveals that instead of initiating an investigation of Levingston's animal abuse allegations as represented by Nix in his June 1, 1999 memorandum to Levingston, Nix, who was not a veterinarian, wrote a memorandum on June 10, 1999 to Dr. Ardath Payne, the Assistant Director of the Department of Health and Human Services, recommending that both Levingston and Hanna be indefinitely suspended from BARC because they were "negligent in the treatment of [a] female Rottweiler." Nix based his recommendation on a June 2, 1999 report[4] of Hannie Simmons, BARC's Animal Control Officer Supervisor, who, at Nix's direction, investigated the death of the Rottweiler. Nix felt his recommendation to suspend the veterinarians indefinitely was "appropriate" because a 1975 court order,[5] to which the City and BARC had agreed, "expressly state[d]" that the City and BARC had

> a specific and certain public duty to handle and maintain such animals impounded [by BARC] or animals being picked up or carried to said facility by individuals under [BARC's] supervision and employ or at their direction, in a manner such as to avoid any act, omission or neglect which causes any unnecessary or unjustifiable pain or suffering or permits or allows such pain and suffering to continue when there is a reasonable remedy.

Nix also relied on another provision of the agreed order that provided:

> [T]hat all persons in supervisory positions at [BARC] take appropriate steps to discharge any persons whose actions or failure to perform their assigned duties in a reasonably efficient manner results in the inability of [BARC] to effectively implement this order.

Simmons testified that Nix had ordered him to investigate the death of the female Rottweiler, but not the death of the Great Dane. After interviewing several witnesses, including kennel attendants and

---

4. Simmons provided his original report to Nix on May 20, 1999, the same day that Levingston submitted his handwritten complaint to the kennel secretary. The June 2, 1999 report amended the previous May 20, 1999 report "to reflect a misinterpretation of the assignment schedule for veterinary technicians."

5. The "Agreed Order," which the parties agreed was in effect at the time of the trial of the instant case, had been previously entered in *Mr. Peter Haig, et al. v. The City of Houston, Texas et al.*, Cause No. 963,872, in the 163rd District Court of Harris County, Texas. The order was entered when BARC was previously known as "the City of Houston Rabies Control Facility."

the veterinarians, Simmons learned that the Rottweiler and her nine puppies had been delivered to BARC on April 28, 1999. Two kennel attendants told Simmons that on April 30, they told Levingston that the dog was bleeding, and he told them to inform Dr. Abigail Arredondo [6] to examine the dog. Another kennel attendant told Simmons that, on May 2, he told Hanna of the dog's condition. Hanna treated the dog for diarrhea with an oral medication and contacted the owner, who told Hanna that he would pick up the dog and the puppies on May 3. Another kennel attendant told Simmons that, on May 3, the dog was bleeding, and he notified Hanna, who examined the dog and told Rollins that the owner was supposed to pick up the dog. Hanna told Simmons that, on May 4, he observed the dog to be "normal, alert and moving around," and he again tried to contact the owner.

On May 6, a kennel attendant informed Nix that he should take a look at the dog. Nix directed Levingston to treat the dog. Levingston treated the dog with subcutaneous fluids and tried to contact the owner. A kennel attendant found the dog dead in its pen the next morning, and the remaining puppies had to be euthanized. Hanna informed Nix that the only treatment for the dog's condition would have been a hysterectomy, but the owner would have had to agree to the surgery.

In his June 2 report, Simmons concluded that the evidence indicated that "members of the clinic staff were negligent and derelict by failing to follow up on the dog in question even after they were aware of the dog's condition for at least six days." Simmons, who is not a veterinarian, opined that the "veterinarians failed to ensure the animal was treated in a manner which would have provided it an opportunity to survive its illness" and the "animal was left to suffer for a period of over 24 hours due to a lack of examination and treatment."

Simmons testified that although he had "generally" heard from within BARC that Levingston had made complaints about the treatment of animals at BARC, the first time that Simmons became aware that Levingston had communicated his complaints to Nix was on August 5, 1999, when Simmons found, in the doorway of Nix's office, one of Levingston's written reports complaining of a lack of food and water for certain animals. Although Nix testified that he had asked Simmons to investigate Levingston's allegations of animal abuse at BARC, Simmons testified that Nix never "asked [Simmons] to look into inhumane treatment of animals as alleged by Levingston." Simmons explained that in his 18 years of experience at BARC, he had never been asked to investigate animal abuse and neglect by a kennel attendant or clinical staff. In fact, Levingston's was the first instance of which he was aware involving a BARC investigation into a clinic staff member's treatment of an animal. Although Simmons had investigated between 20 and 25 instances of mistreatment of animals by animal control officers, he found some evidence of mistreatment in only three cases, and none of the animal control officers involved in the instances were indefinitely suspended.

The Great Dane, to which Kendrick's letter referred, was admitted to BARC and placed in quarantine for suspicion of rabies because it had bitten a United States Postal Carrier. Dr. Jesus Martinez,[7] a veteri-

---

6. The record reveals that although Arrendondo was a veterinary technician at BARC, he had been trained and licensed as a veterinarian in Mexico.

7. The record reveals that although Martinez was a veterinary technician supervisor at BARC, he had been trained and licensed as a veterinarian in Mexico.

nary technician supervisor, testified that he told Levingston on July 22, 1999 that the dog "was foaming from the mouth" and that he noticed "a lot of vomit around the mouth and going down to the ... legs." Although Martinez expected Levingston "to check" the dog, Levingston told him that the dog was "okay." The dog died the following day. On July 23, 1999, Nix reported the death of the Great Dane to Payne and stated:

> The dog exhibited some signs of illness yesterday but did not appear to be in a condition which would cause its death last night. A veterinarian examined the animal yesterday and found no cause for alarm as to rabies.

Subsequent testing revealed that the dog was not rabid. However, based on Martinez's representations, Nix, on July 26, 1999, wrote another memorandum to Payne stating that Levingston "did not personally examine the dog" and that there "was no treatment given the dog." He also noted that Levingston "did not speak with the owner to tell him that the dog had died and the owner came to BARC late in the afternoon to reclaim the dog." Nix concluded that Levingston's "failure to follow procedure caused undue stress and discomfort to employees at BARC who are not responsible to advise the owner of such a death." In his trial testimony, Nix conceded that he had "zero evidence of wrongdoing against Levingston that he in any way, shape or form caused the death of the Great Dane."

Kendrick, who was a medical doctor and not a veterinarian, testified that she sent the September 1, 1999 letters to Hanna and Levingston to advise them that it had been recommended that their employment be terminated and to give them a chance to respond to the charges against them in a *Loudermill*[8] hearing set for September 17, 1999. Due to medical complications associated with his receipt of the letter, Levingston's hearing was postponed until January 7, 2000. After Hanna's September 17 hearing, Kendrick recommended to then Mayor Lee P. Brown that Hanna be indefinitely suspended. Hanna then chose to retire in lieu of being indefinitely suspended.

In late October 1999, the City hired Dr. Nick DeWees to write a report about the deaths of the Rottweiler and the Great Dane. DeWees testified that he obtained his degree in veterinary medicine and became a licensed veterinarian in May of 1998. In his report to Kendrick, dated November 15, 1999, DeWees stated:

> The information provided to me concerning Dr. Levingston's management of the female Rottweiler, with vaginal bleeding, in my opinion showed gross neglect for animal welfare.... [The dog] was not appropriately attended to. Simple laboratory tests, such as a hematocrit or total serum protein, could have identified if this dog was suffering from severe blood loss from either the reproductive tract or the gastrointestinal tract.... [T]his dog in my opinion had a severe medical condition and was in moderate pain and could have been justifiably euthanized prior to May 6, 1999. The second course of action would have been to institute the medical care and

---

8. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). "A *Loudermill* hearing is held after a determination is made by the City regarding an employee's alleged violations. The employee, any attorneys, and those who investigated the alleged violations attend the hear-

ing. The purpose of the hearing is to give the employee an opportunity to present information the employee may feel is helpful to his or her case." *City of Houston v. Morris,* 23 S.W.3d 505, 507 n. 1 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

diagnostics necessary to safeguard the dog's well being until the dog was better or the owner specifically refused such treatment.... Post-partum bleeding of this magnitude should have alerted a reasonably trained veterinarian of the potential for a retained fetus, retained fetal membranes, or a ruptured uterus.... If the discharge was thought to be fecal in origin then why was the dog not tested for Parvoviral enteritis?

In regard to the Great Dane, DeWees stated:

Examining an animal through a fence does not allow one to accurately assess what type of problem the dog may have. Potentially the dog had a *Bordatella* or a Parainfluenza infection, which leads to "Kennel Cough." This is a very common problem in animal containment facilities.... [Regarding Dr. Levingston's concern about] a twisted intestine, which is more correctly known as gastric dilation and volvulus or GDV, ... GDV can be easily diagnosed and if diagnosed in time surgery can be life saving. A diagnosis of GDV is made definitively by taking a radiograph of the abdomen. Given a good physical exam, knowing the breed and clinical symptoms a diagnosis can be frequently made without radiographs.

DeWees concluded:

The management of the Rottweiler can definitely be seen as malpractice and could be subject to civil and state regulatory action if it occurred in private practice.... Failure to give the Great Dane a physical examination is evidence of negligence.

....

These incidents, coupled with past disciplinary actions, certainly warrant strong disciplinary action now. If these events were to take place in my hospital or any of my colleague's hospitals I feel the proposed disciplinary action would be similar to that given in the private sector.

Kendrick testified that she conducted Levingston's *Loudermill* hearing on January 7, 2000 and then recommended to Mayor Brown that Levingston's employment be terminated. In her testimony, Kendrick conceded that it was "most likely" that Levingston's employment would not have been terminated but for Nix's recommendation of indefinite suspension.

In his March 23, 1999 letter informing Levingston of his indefinite suspension from BARC, Mayor Brown, apparently relying heavily on DeWees's report, specifically noted, in regard to the Rottweiler, that

[Levingston] never ordered or requested any laboratory tests, even those normally indicated for any post-partum animal with a medical problem.... [I]t was Dr. Levingston's duty and responsibility to timely and appropriately order treatment or euthanasia for the animal.

In regard to the Great Dane, Mayor Brown noted:

A visual assessment of an animal through a fence or a pen does not allow one to accurately assess what type of problem an animal may have. It certainly does not allow a dog to be examined for a Bordatella or Parainfluenza infection which can lead to "Kennel Cough." Kennel Cough is a common problem with large dogs in animal containment facilities.

Mayor Brown explained that Levingston's actions violated the City's policy that employees "give a productive day's work *to the best of their abilities and skills.*" He also explained that Levingston's actions violated various provisions of "the Texas Administrative Code governing the Rules of Professional conduct for Veterinarians

as established by the Texas State Board of Veterinary Medical Examiners." In regard to the *Loudermill* hearing, Mayor Brown concluded that because Levingston's explanations to Kendrick were "not satisfactory" and because "previous disciplinary actions have failed to correct his unacceptable and unprofessional conduct," Kendrick "was left with no alternative" but to "recommend infinite suspension for Levingston. I concur with this recommendation."

On March 30, 2000, Levingston appealed to the Civil Service Commission for Municipal Employees, which, on April 13, 2000, upheld the indefinite suspension. Levingston then filed this lawsuit on May 19, 2000. Kendrick reported Levingston's conduct in regard to the Rottweiler and the Great Dane to the Texas State Board of Veterinary Medical Examiners, which closed the case with "no violations found."

The jury found that Levingston's reports to BARC "of torture, unreasonable failure to provide necessary food or care, and/or transport or confinement in a cruel manner of animals in the custody of the City of Houston" were made "in good faith" and were "a cause of the City of Houston's terminating his employment when it did." The jury awarded Levingston $116,500 for past lost wages, $250,000 for future lost wages, $500,000 for past compensatory damages, and $375,000 for future compensatory damages.

The City filed an amended motion for judgment notwithstanding the verdict, contending that Levingston did not report a violation of law, did not make a report to an appropriate law enforcement authority, produced no evidence that his alleged reports caused his adverse employment action, and produced no evidence to support the jury's award on mental-anguish damages or its award for future pecuniary losses. The City also argued that the trial court erred in denying its proposed jury instruction on its affirmative defense.

After a hearing to determine the "productivity" of reinstating Levingston, the trial court, in its final judgment, awarded Levingston $235,000 as the "value of reinstatement" to his "former position or an equivalent position, fringe benefits and seniority rights lost because of the termination." It also awarded Levingston $116,500 for past lost wages, "compensatory damages capped at the amount of $250,000," $194,107.50 for attorneys' fees, and $12,796.58 for court costs. The trial court further awarded Levingston prejudgment interest "on the amount of $365,500" and post-judgment interest on the entire amount of the judgment.

## Standard of Review

■ A trial court may "disregard any jury finding on a question that has no support in the evidence" and render a judgment notwithstanding a jury's verdict "if a directed verdict would have been proper." Tex.R. Civ. P. 301. In regard to the City's no-evidence issues,[9] we note that

---

9. Although the City, in the "Summary of the Argument" portion of its brief, states that the evidence is, alternatively, "factually insufficient" to show that Levingston had a good faith belief that BARC was an appropriate law enforcement authority and that there was no nexus between his complaints and the termination of his employment, the City makes no such argument under issues one and two in its brief. Also, although the City, in the "Argument" portion of its brief, contends that the

evidence is "factually insufficient" to support the jury's award of mental-anguish damages and is "against the overwhelming weight of the evidence," the City makes no substantive argument in support of its conclusion. Thus, any points concerning factual sufficiency were inadequately briefed. *See* Tex.R.App. P. 38.1.

More importantly, a point in a motion for new trial is a prerequisite to a complaint on

when a party without the burden of proof challenges the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998); *Ned v. E.J. Turner & Co.*, 11 S.W.3d 407, 408 (Tex. App.-Houston [1st Dist.] 2000, pet. denied). If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.*,

650 S.W.2d 61, 63 (Tex.1983)). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is legally sufficient evidence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003).

## Texas Whistleblower Act

In its first and second issues, the City argues that the trial court erred in denying its motion for judgment notwithstanding the verdict because Dr. Levingston produced no evidence in support of the jury's findings that (1) Levingston made a report of what he believed, in good faith, was a violation of law to an appropriate law enforcement authority and (2) this was a cause of the City's termination of his employment.[10]

---

appeal that the evidence is factually insufficient to support a jury finding and that a jury finding is against the overwhelming weight of the evidence. Tex.R. Civ. P. 324(b)(2), (3); *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991). The City did not raise a factual sufficiency point in its motion for new trial, and, thus, the City has failed to preserve any factual sufficiency issues for our review. *Id.* at 511–12.

**10.** Question 1 of the trial court's charge asked the jury:

> Were Sam Levingston's reports to BARC, if any, of torture, unreasonable failure to provide necessary food or care, and/or transport or confinement in a cruel manner of animals in the custody of the City of Houston, made in good faith and a cause of the City of Houston's terminating his employment when it did?

Within question 1, the trial court instructed the jury that

> "[g]ood faith" means that the employee believed that (1.) the conduct reported was a violation of law, (2.) the governmental entity was authorized to (a) regulate under or enforce the law alleged to be violated in the report, or (b) investigate or prosecute a violation of criminal

law; and the employee's belief with respect to both (1.) and (2.) was reasonable in light of the employee's training and experience.

The trial court further instructed the jury that

> [e]vidence that establishes a causal link between the adverse employment action and the reporting of illegal conduct includes:
> 1. Knowledge of the report of illegal conduct;
> 2. Expression of a negative attitude toward the employee's report of the conduct;
> 3. Failure to adhere to established policies regarding employment decisions;
> 4. Discriminatory treatment in comparison to similarly situated employees; and
> 5. Evidence that the stated reason for the adverse employment action was false.

Plaintiff's reports were not a cause if the City of Houston would have terminated him based solely on information, observation, or evidence that is not related to the fact that he made the reports.

The jury answered "yes" to question 1.

■■■ The Texas Whistleblower Act ("the Act") is designed to enhance openness in government and to compel the government's compliance with law by protecting those who inform authorities of wrongdoing. *See Davis v. Ector County,* 40 F.3d 777, 785 (5th Cir.1994) (quoting *Castaneda v. Tex. Dep't of Agric.,* 831 S.W.2d 501, 503 (Tex.App.-Corpus Christi 1992, writ denied)). The Act evidences two legislative purposes: (1) to protect public employees from retaliation by their employer when, in good faith, employees report a violation of the law and (2) in consequence, to secure lawful conduct on the part of those who direct and conduct the affairs of public bodies. *Travis County v. Colunga,* 753 S.W.2d 716, 718–19 (Tex.App.-Austin 1988, writ denied). Because the Act is remedial in nature, it should be liberally construed to effect its purpose. *Castaneda,* 831 S.W.2d at 503; *Davis,* 40 F.3d at 785.

The Act provides, in pertinent part, as follows:

 (a) A State or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.

 (b) In this section, a report is made to an appropriate law enforcement authority if the authority is part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to:

 (1) regulate under or enforce the law alleged to be violated in the report; or

 (2) investigate or prosecute a violation of criminal law.

Tex. Gov't Code Ann. § 554.002 (Vernon 2004).

### Good–Faith Belief

In its first issue, the City contends that Levingston failed to prove that "a reasonably prudent veterinarian would have a good-faith belief" that he reported a violation of law to an appropriate law enforcement authority. It asserts that in denying its motion for judgment notwithstanding the verdict, the trial court misinterpreted the precedent of *Texas Department of Transportation v. Needham,* 82 S.W.3d 314, 320–21 (Tex.2002) and *Wichita County v. Hart,* 917 S.W.2d 779, 784 (Tex.1996).

In regard to subsection (a) of section 554.002, the Texas Supreme Court held in *Hart* that " 'good faith' means that (1) the employee believed that the conduct reported was a violation of law and (2) the employee's belief was reasonable in light of the employee's training and experience." 917 S.W.2d at 784. The test's first element—the "honesty in fact" element—ensures that an employee seeking a Whistleblower remedy believed that he was reporting an actual violation of the law. *Id.* at 784–85. The test's second element ensures that, even if the reporting employee honestly believed that the reported act was a violation of law, the reporting employee receive the Act's protection only if a reasonably prudent employee in similar circumstances would have believed that the facts as reported were a violation of the law. *Id.* at 785. Thus, the *Hart* test includes both a subjective and objective element.

■■■ The Texas Supreme Court subsequently concluded in *Needham* that the same test applies to determine, under subsection (b) of section 554.002, if a public employee in good faith believed that the governmental entity to which he reported a violation of law was an appropriate law

enforcement authority. 82 S.W.3d at 320–21. Thus, in the context of section 554.002(b), "good faith" means that

(1) the employee believed the governmental entity was authorized to (a) regulate under or enforce the law alleged to be violated in the report, or (b) investigate or prosecute a violation of criminal law; and

(2) the employee's belief was reasonable in light of the employee's training and experience.

*Id.* at 321.

*Violation of Law*

■ The City first argues, under *Hart,* that because of Levingston's "training as a licensed Veterinarian and his 40 years of experience, it was not reasonable for him to believe that his complaints to Nix that the animals were not being fed, watered, and handled properly; that the kennel master was not doing his job; and that kennel employees needed to carry out their duties *was a violation of any law, let alone the animal cruelty statute.*" (Emphasis added.) It asserts that "as a veterinarian," Levingston knew that "just because an animal's food or water dish was empty, at any given time, and in that one occurrence, was not an indication of animal cruelty."

Relying on *City of Houston v. Kallina,* 97 S.W.3d 170, 175 (Tex.App.-Houston [14th Dist.] 2002), the City asserts that in making the complaints, Levingston was merely doing his job because he, "like Kallina, had a duty to report mistreatment of animals." *Kallina,* however, does not support the City's argument that Levingston produced no evidence in support of the jury's finding that he made a report of what he believed, in good faith, was "a violation of any law." In the portion of *Kallina* cited by the City, the court was concerned with whether an employee's "re-porting violations of the City's inventory procedures" entitled him to protection under the Act. 97 S.W.3d at 174. The court noted that the employee pointed to no City ordinances that were violated, but, rather, relied on two City policy manuals that, he asserted, contained "rules adopted under an ordinance." In concluding that the employee was not entitled to the Act's protection, the court explained that it was "quite clear that these manuals (and the hundreds of pages they contain) reflect internal policies rather than rules promulgated pursuant to an ordinance." *Id.* at 175.

Although, as pointed out by the City, Levingston testified that his complaints did concern employee performance failures and that he wanted Nix to take corrective action, he further testified that "[i]t's against the law to treat the animals inhumanely" and that he, as a senior veterinarian at BARC, had occasions "to investigate animal abuse with a team from BARC." Specifically, Levingston notes that his reports to Nix concerned the violation of certain provisions of the Houston City Code, the Texas Penal Code, and the Texas Health and Safety Code.

It is important to note that the very city ordinance that concerns the responsibilities of the City's Department of Health and Human Services and BARC in regard to animals and fowl states that

[e]very . . . caretaker . . . of any animal within the city limits shall be required to observe the following rules, regulations, terms and conditions in connection with the care, keeping and using of such animals, and *any person violating any provisions hereof shall be deemed guilty of an offense:*

(1) All stables or other enclosures in which such animal is kept and the ground upon which same is situated shall be kept and maintained in a clean and sanitary condition, and all

stables and fences surrounding such lot where the animal is kept and the feed troughs and water troughs, with which such animals are fed and watered, shall be free from any projection or thing whereon or whereby such animal may be injured.

(2) All animals shall be fed with a quantity of good, wholesome food sufficient to keep them in a good, well-nourished condition, and such food shall be served to such animals in a clean, sanitary manner.

. . . .

(9) All animals shall be provided with pure, clean water in sufficient quantities at all times.

HOUSTON, TEX., ORDINANCES ch. 6, art. I., § 6–6(1), (2), (9) (emphasis added). The City Code further provides that

[t]he violation of any provision of this chapter 6 is hereby declared to be unlawful. Unless another penalty is expressly applicable as provided in any section or subsection hereof, then a violation shall be punishable as provided in section 1–6 of this Code and the provisions of section 1–6 are expressly invoked for such purpose.

*Id.* ch. 6, art. I., § 6–1(c). Section 1–6(a) provides that "the violation of any such provision of this Code or any such ordinance shall be punished by a fine not exceeding $500." *Id.* ch. 1, § 1–6(a). Many of Levingston's reports to Nix against BARC employees, including those reports concerning the deprivation of food and water, the rationing of food, and the placement of animals in unsafe conditions in which they were injured or killed, concerned the violation of the above cited provisions of the City Code.

Also, the Texas Penal Code prohibits much of the conduct that Levingston reported to Nix. The Penal Code provides, in pertinent part, that a person commits the offense of "Cruelty to Animals" if the person intentionally or knowingly

(1) tortures an animal;

(2) fails unreasonably to provide necessary food, care, or shelter for an animal in the person's custody;

. . . .

(4) transports or confines an animal in a cruel manner;

(5) kills [or] seriously injures . . . an animal . . . belonging to another without legal authority or the owner's effective consent;

(6) causes an animal to fight with another;

. . . .

(9) injures an animal . . . without legal authority or the owner's effective consent.

TEX. PEN.CODE ANN. § 42.09(a) (Vernon Supp.2005). The term "cruel manner" includes "a manner that causes or permits unjustified or unwarranted pain or suffering." *Id.* § 42.09(c)(3). "Necessary food, care, or shelter" includes "food, care, or shelter provided to the extent required to maintain the animal in a state of good health." *Id.* § 42.09(c)(5). An offense under subsection (a)(2), (4), or (9) is a Class A misdemeanor. *Id.* § 42.09(d). An offense under subsection (a)(1), (5), or (6) is a state jail felony. *Id.* § 42.09(i). Many of Levingston's complaints to Nix against BARC employees concerned violations of the above provisions of the Penal Code, including those involving the deprivation of food, the rationing of food, and the placement of animals in unsafe conditions in which they were injured, caused to fight over food, or killed. His report of transporting animals in BARC trucks with defective air conditioners concerned violations of subsection (4). Levingston's allegations about kennel attendants' holding the heads of animals under dip, jerking

dogs off of BARC trucks creating "painful breaks," pitching puppies "like a baseball from the truck to the holding pen," and killing cats "in burlap sacks by throwing them under the back wheels of a truck" concerned torture under subsection (1) and, in regard to the cats, killing under subsection (5).

Moreover, in regard to the treatment of "impounded animals," the Texas Health and Safety Code requires "a person who impounds or causes the impoundment of an animal under state law or municipal ordinance" to "supply the animal with sufficient wholesome food and water during its confinement." TEX. HEALTH & SAFETY CODE ANN. § 821.002(a) (Vernon 2003). If such an impounded animal "continues to be without necessary food or water for more than 12 successive hours, any person may enter the pound . . . as often as necessary to supply the animal with necessary food and water." Id. § 821.002(b). In regard to the disposition of cruelly treated animals, an "officer who has responsibility for animal control in a county or municipality" who has reason to believe that an animal is being "cruelly treated," may apply to a justice court or a municipal court for a warrant to seize the animal. Id. § 821.022(a) (Vernon Supp.2005). The statute states that the term "cruelly treated" includes "tortured, . . . unreasonably deprived of necessary food, care, or shelter, cruelly confined, or caused to fight with another animal." Id. § 821.021 (Vernon 2003). Here, Levingston's reports to Nix about the deprivation of food and water and the rationing of food concerned the violation of section 821.002. Also, under their regulatory and enforcement function, the City's animal control officers, under section 821.022, may obtain a warrant to seize "cruelly treated" animals.

Just because many of Levingston's reports to Nix "concerned employee per-

formance failures" does not mean that his reports of the above cited instances did not concern "a violation of any law." The Act defines "[l]aw" as

(A) a state or federal statute;

(B) an ordinance of a local governmental entity; or

(C) a rule adopted under a statute or ordinance.

TEX. GOV'T CODE ANN. § 554.001(1) (Vernon 2004). A criminal or "penal" statute or law is "[a] law that defines an offense and prescribes its corresponding fine, penalty, or punishment." BLACK'S LAW DICTIONARY 1421 (7th ed.1999). Most of the conduct described by Levingston constituted violations of criminal law. He testified that the conduct was against the law and that he, as a BARC senior veterinarian, had participated in the investigation of animal-abuse allegations with other BARC employees. Here, the pertinent provisions of the Penal Code and the City Code, which provide that "any person violating any provisions hereof shall be deemed guilty of an offense" and assesses a fine of up to $500, are "criminal laws" under the Act. Moreover, the above pertinent provisions of the Health and Safety Code, concerning the treatment and disposition of animals, implicate the regulatory and enforcement functions of BARC's animal control officers.

We conclude that the City's arguments that (1) it was not reasonable for Levingston to believe that his complaints to Nix about animal abuse at BARC concerned the violation of any law and that (2) Levingston failed to prove that "a reasonably prudent veterinarian would have a good-faith belief" that he reported a "violation of any law" are without merit. Levingston satisfied both the objective and subjective elements of the *Hart* test. *See* 917 S.W.2d at 784–85. Accordingly, we hold that the evidence is legally sufficient to support the

jury's implied findings that Levingston, in good faith, believed that the conduct that he reported to Nix was a violation of criminal law and also implicated the regulatory and enforcement function of BARC and that his belief was reasonable in light of his training and experience.

*Appropriate Law Enforcement Authority*

The City next argues, under *Needham*, that because of Levingston's education and 40 years of veterinary experience, "it is simply not objectively reasonable" that he, in good faith, believed that BARC had "police or enforcement powers." It contends that there was no evidence that Levingston's "report of a violation of the Penal Code to John Nix met the objective component of the definition of good faith under the Act" and that there was "no credible evidence presented to the jury that a senior veterinarian would have an objective good faith belief that BARC was an appropriate law enforcement authority for the report of a violation of the penal code."

■ We note at the outset that the Act does not apply only to reports of criminal offenses under the Texas Penal Code. Under the Act, an appropriate law enforcement authority is a governmental entity authorized to "regulate under or enforce the law alleged to be violated." TEX. GOV'T CODE ANN. § 554.002(b)(1) (Vernon 2004); *Needham*, 82 S.W.3d at 320. Alternatively, an appropriate law enforcement authority is a governmental entity authorized to "investigate or prosecute a violation of criminal law." TEX. GOV'T CODE ANN. § 554.002(b)(2); *Needham*, 82 S.W.3d at 319. It is not enough that a governmental entity has general authority to regulate, to enforce, to investigate, or to prosecute. *Needham*, 82 S.W.3d at 319. Rather, the governmental entity must be authorized either to (1) regulate under or to enforce "the law alleged to be violated" or (2)

investigate or to prosecute "a violation of criminal law." *Id.* at 320. Thus, we must determine whether BARC had the authority to regulate under, to enforce, to investigate, or to prosecute the reported violations of the City Code, the Texas Penal Code, and the Health and Safety Code. *Id.* at 320.

■ In support of its arguments, the City again asserts that Levingston was merely "complaining to a supervisor that employees were not performing their duties, a complaint targeted to initiate corrective action or discipline." It also asserts that Levingston "knew that BARC did not prosecute complaints of animal cruelty," and it refers us to the testimony of Earl Travis, the Deputy Director of the City's Department of Health and Human Services and former Division Manager of BARC, who stated generally that BARC could not "enforce" section 42.09 of the Texas Penal Code. The City asserts that

> BARC is not, nor could it ever be considered, a law enforcement authority. It is disingenuous for Levingston to even suggest that it was.

This representation, made in the City's brief and repeated at oral argument, is in direct contradiction to the testimony of Travis that "BARC has law enforcement responsibilities in animal related issues within the City of Houston." Travis testified that BARC, under Chapter 6 of the City Code, "was charged, as an organization, with enforcing animal ordinances."

As noted above, many of Levingston's specific reports to Nix against BARC employees, including those involving the deprivation of food and water, the rationing of food, and the placement of animals in unsafe conditions in which they were injured or killed, concerned violations of the City Code. *See* HOUSTON, TEX., ORDINANCES ch. 6, art. I, § 6–6(1), (2), (9). Moreover,

Section 6–19 of the City Code, titled "Powers of enforcement officers," states that "[t]he health officer, the animal control officers and other authorized employees of the [D]epartment [of Health and Human Services] *shall have all of the powers and authority of police officers* to the extent only and no further of enforcing this chapter and other ordinances of the city relating to animals and fowl." *Id.* § 6–19 (emphasis added). Section 6–20 of the City Code, titled "Notice of violations," provides:

> All duly appointed and qualified *peace officers*, the animal control officers of the [D]epartment [of Health and Human Services] ... are authorized to issue written citations to persons violating this chapter or any other ordinance governing the regulation of animals.

*Id.* § 6–20 (emphasis added). Accordingly, we hold that BARC was an appropriate law enforcement authority under the Act to which to report a violation of sections 6–6(1), (2), and (9) of the City Code.

■ In regard to Levingston's assertions that many of his complaints against BARC employees concerned violations of the Texas Penal Code, the City states that "BARC had no authority to and never enforced the Penal Code regarding animal abuse or cruelty." It also asserts that "[n]o BARC Division Manager had ever and, further, was not authorized to regulate, enforce, investigate or prosecute violations of animal cruelty laws." We note, however, that section 6–20 of the City Code actually contemplates the employment of "peace officers" by the Health and Human Services Department, and it authorizes such "peace officers" and animal control officers to issue citations for violations of Chapter 6. *Id.* § 6–20. All peace officers have the duty "to preserve the peace within the officer's jurisdiction" by "all lawful means." TEX.CODE CRIM. PROC.

ANN. art. 2.13(a) (Vernon 2005). All peace officers are also statutorily required, "in every case" authorized by the provisions of the Texas Penal Code, to "interfere without warrant to prevent or suppress crime" and "arrest offenders without warrant in every case where the officer is authorized by law." *Id.* art. 2.13(b)(1), (4). Peace officers must also "give notice to some magistrate of all offenses ... where the officer has good reason to believe there has been a violation of the Texas Penal Code." *Id.* art. 2.13(b)(3). Thus, any peace officers actually employed by BARC would be statutorily required to enforce section 42.09 of the Texas Penal Code.

Additionally, the very same 1975 court order upon which Nix relied in making his recommendation to Kendrick that Levingston be indefinitely suspended from BARC expressly states:

> [t]hat all persons in supervisory positions at [BARC] *file charges under the appropriate provisions of the Criminal Statutes of the State of Texas against any and all persons under their supervision* who are known by said supervisory persons, now or in the future, to have violated such provisions of the Criminal Statutes of the State of Texas while on the premises of [BARC] or while purportedly performing their duties as employees of [BARC] no matter where such actions take place, and that such supervisory persons *shall give such testimony as they may be required* or able to give in all cases where such charges are filed and that such supervisory persons shall *do all things reasonably within their power to see that such charges are prosecuted.*

(Emphasis added.) This order was agreed to and signed by the City's then "Senior Assistant City Attorney." Not only did Nix, as Division Manager of BARC, have the power to investigate such violations of

the Texas Penal Code by those under his supervision, but he also had the legal duty to do so and to "file charges" and to provide evidence against those persons. In fact, in his June 1, 1999 memorandum to Levingston, Nix represented to Levingston that he was "greatly disturbed" by Levingston's allegations and that he had "initiated an investigation" of the allegations "to initiate appropriate action against parties who participate in such mistreatment."

Accordingly, we hold that BARC was an appropriate law enforcement authority under the Act to report violations of section 42.09 of the Texas Penal Code committed by BARC employees. Given Nix's supervisory position over all of BARC, he was certainly in the best position to receive such reports on behalf of BARC.

■ Finally, as noted above, section 821.002(a) of the Health and Safety Code specifically applies to employees of governmental entities like BARC. It requires that all BARC employees "supply . . . animal[s] with sufficient wholesome food and water during [their] confinement." TEX. HEALTH & SAFETY CODE ANN. § 821.002(a). Nix, as BARC's Division Manager, was obviously in the best position to make sure that the employees working under him were in compliance with this statute. Also, as noted above, BARC's animal control officers, under their regulatory and enforcement function pursuant to section 821.022, have the ability to obtain a warrant to seize any "cruelly treated" animals. Accordingly, we hold that BARC was an appropriate law enforcement authority under the Act to report violations of sections 821.002 and 821.022 of the Health and Safety Code.

Relying on *Kallina* and *City of Weatherford v. Catron*, 83 S.W.3d 261 (Tex.App.-Fort Worth 2002, no pet.), the City asserts that Levingston, in making his complaints to Nix, was merely doing his job, i.e.,

reporting that BARC "employees were not preforming their duties, a complaint targeted to initiate corrective action or discipline." It also notes that the statutory definition of "an appropriate law enforcement authority" does not include "an employer's general power to investigate or power to internally discipline its own employees for an alleged violation."

In *Catron*, the court held, as a matter of law, that the City of Weatherford was not an appropriate law enforcement authority under section 554.002(b) of the Act for the reporting of another employee's violation of federal or state sexual harassment laws. 83 S.W.3d at 268–69. It noted that the municipality's general authority to regulate under, to enforce, and to investigate claims of sexual harassment was not enough to make it an appropriate law enforcement authority under the Act. *Id.* at 268. The court also noted that the plaintiff employee's reports of harassment to the personnel director and the utilities director "all point[ed] to the municipality's internal discipline." *Id.* at 269. Thus, the court further held that there was no evidence that the employee had a good-faith belief that the municipality was an appropriate law enforcement agency for reports of sexual harassment. *Id.*

In the portion of *Kallina* cited by the City as authority that BARC is not an appropriate law enforcement authority for reports of animal abuse, the court addressed the issue of whether the plaintiff employee's supervisor was a representative of an appropriate law enforcement authority for a theft report. 97 S.W.3d at 172–73. The court noted that the supervisor had the "authority to investigate employees' conduct and carry out internal disciplinary procedures, but no authority to enforce the theft laws of the state of Texas." *Id.* at 174. Because the plaintiff employee "knew" that the supervisor

"could only forward evidence of theft to the police for actual investigation and prosecution," the court held that the supervisor's department "was not an appropriate law enforcement authority under the Whistleblower Act, and there was no evidence that [the employee] had an objectively reasonable belief otherwise." *Id.*

Both *Catron* and *Kallina* are substantively distinguishable from the instant case. In neither case did the governmental entity have the authority either to (1) regulate under or to enforce "the law alleged to be violated" or (2) investigate or to prosecute a "violation of criminal law." *See Needham*, 82 S.W.3d at 319–20.

Here, in contrast, BARC had the authority to regulate under or to enforce sections 821.002 and 821.022 of the Health and Safety Code. More importantly, it had the authority to investigate violations of criminal law, i.e., violations of sections 6–6(1), (2), and (9) of Chapter 6 of the City Code and section 42.09 of the Texas Penal Code committed by BARC employees. All "peace officers and animal control officers" employed by BARC could in fact issue citations for violations of Chapter 6, and all BARC supervisors, including Nix, were subject to an agreed-to court order to investigate, to file charges against, and to present evidence against any BARC employee who violated section 42.09 of the Texas Penal Code. Although Levingston testified that he made his reports to Nix to correct the persistent problems at BARC, he also testified that he made his reports to Nix at BARC and "not someone else" because

> [i]t's against the law to treat the animals inhumanely. This is the authority for which the inhumane treatment should be reported to. And it's the law.

He elaborated:

> BARC is an agency that has the ability to make investigations. They are the

law. They have to enforce the law, and that's why I felt that BARC was the agency that I should go to.

He further testified that he, himself, "did go out a few times to investigate animal abuse with a team from BARC."

We conclude that Levingston satisfied both the objective and subjective elements of the *Needham* test. *See* 82 S.W.3d at 321. We hold that the evidence is legally sufficient to support the jury's implied findings that Levingston, in good faith, believed that BARC was an appropriate law enforcement authority to which to report the above pertinent violations of the City Code, the Texas Penal Code, and the Health and Safety Code and that his belief was reasonable in light of his training and experience.

Accordingly, we further hold that the trial court did not err in denying the City's motion for judgment notwithstanding the verdict on the grounds that Levingston failed to prove that "a reasonably prudent veterinarian would have a good-faith belief" that he had reported a violation of law to an appropriate law enforcement authority.

We overrule the City's first issue.

### Causation

In its second issue, the City argues that the trial court erred in denying its motion for judgment notwithstanding the verdict because Levingston produced no evidence that his reports to Nix caused the termination of his employment. The City contends that Levingston wrote his May 20, 1999 letter to Nix complaining of the inhumane treatment of animals "to forestall the inevitable consequences of his malpractice in allowing the mother Rottweiler to bleed to death." In support of this contention, the City asserts that Levingston's complaints began only after Simmons's investi-

gation of the death of the Rottweiler had begun.

■ Initially, we note that Levingston contends that because Nix's recommendation to terminate Levingston's employment occurred within 90 days of his May 20, 1999 letter, "it is presumed that a causal nexus existed between his reports and the termination recommendation." The Act allows for a presumption, "subject to rebuttal," of the causal connection if the employee is terminated or suspended not later than 90 days after the reported violation of law. TEX. GOV'T CODE ANN. § 554.004(a) (Vernon 2004). However, the presumption does not shift the burden of proof and stands only in the absence of contrary evidence. *Tex. Natural Res. Conservation Comm'n v. McDill*, 914 S.W.2d 718, 723 (Tex.App.-Austin 1996, no writ). Once sufficient evidence is produced to support a finding of the non-existence of the causal connection between the termination or suspension and the reported violation of law, the case proceeds as if no presumption had ever existed. *Id.* at 724. Here, the City presented evidence that Nix recommended the termination of Levingston's employment based not on his reports of illegal activity at BARC, but on his negligent treatment of the Rottweiler and the Great Dane. Accordingly, we hold that Levingston was not entitled to the presumption of section 554.004(a).

■ To prove causation in a Whistleblower case, a public employee must demonstrate that after he reported a violation of law, in good faith, to an appropriate law enforcement authority the employee suffered discriminatory conduct by his employer that would not have occurred when it did had the report not been made. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex.2000) (citing *Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 633 (Tex. 1995)). In other words, the employee must establish a "but for" causal nexus between his report of the illegal activity and the employer's prohibited conduct. *McDill*, 914 S.W.2d at 723. However, the employee need not prove that his reporting of the illegal activity was the sole reason for the employer's adverse action. *Hinds*, 904 S.W.2d at 634.

■ Circumstantial evidence may be sufficient to establish such a causal link between the adverse employment action and the reporting of the illegal conduct. *Zimlich*, 29 S.W.3d at 69. Such evidence includes: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Id.* However, evidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. *Id.*

■ In support of its argument that Levingston "failed to prove that the City's conduct would not have occurred when it did because of the reports," the City asserts that there was "a complete absence of evidence" that Dr. Kendrick had any knowledge of Levingston's reports of a violation of law. It claims that Kendrick testified that Levingston, in the *Loudermill* hearing, did not mention anything about the torture, inhumane treatment, or transportation of animals in a cruel manner. Second, the City contends that there is no evidence that "any employee expressed a negative attitude towards [Levingston's] reports." It claims, to the contrary, that "instead of respond-

ing negatively to the initial reports," Nix "requested additional information ... in order to conduct an investigation into Levingston's written allegations." Moreover, the City contends that there is no evidence that the City failed to adhere to established policies regarding the decision to terminate Levingston's employment, that Levingston received discriminatory treatment in comparison to similarly situated employees, or that its stated reason for terminating Levingston's employment was false. In regard to these last three points, the City notes that Dr. Hanna's employment as a senior veterinarian was also terminated.

However, the evidence, when viewed in a light favorable to Levingston, is ample to show causation under the Act. In regard to Kendrick's knowledge of Levingston's reports, the record reveals that Kendrick was asked if she was "aware at the *Loudermill* [hearing] ... that Levingston had at least verbally talked to John Nix about improprieties at BARC before the Rottweiler incident occurred?" Her answer was, "I don't know, sir. He may have brought it up at the *Loudermill*, but I can't recall it." Under further questioning, Kendrick conceded that after having heard Levingston's complaints about BARC, she in fact asked "staff to look into some of the issues" and told Levingston that she would give him "some feedback" in "the next few days." She stated that she was "concerned" about "certain quality assurance types of things" that were discussed after the *Loudermill* hearing. However, she never gave Levingston any feedback, and she could not recall if anyone had ever come back to her with a report, an assessment, or an investigation. From this evidence, the jury could have reasonably inferred that Kendrick, at least at the time of the *Loudermill* hearing and before her recommendation to the Mayor to terminate Levingston's employment,

was in fact aware of Levingston's reports of animal abuse at BARC. Regardless, Levingston testified that he, on a number of occasions, made Nix directly aware of his reports of animal abuse at BARC, and Kendrick testified that it was "most likely" that Levingston's employment would not have been terminated but for Nix's recommendation of indefinite suspension.

Also, the record does not support the City's representation that no employee expressed a negative attitude toward Levingston's reports and that Nix truly wanted additional information to conduct an investigation into his allegations. The record does reveal, however, that although Nix, in his June 1, 1999 memorandum to Levingston, represented that he had "initiated an investigation" of Levingston's allegations, Nix, in fact, on June 10, 1999, wrote a memorandum to the Assistant Director of the Health and Human Services Department recommending that Levingston be indefinitely suspended from BARC. Also, although Nix testified that he instructed animal control officer Simmons to investigate Levingston's animal abuse allegations, Simmons testified that Nix did not ask him to investigate the allegations. Moreover, Levingston testified that he wrote his May 20, 1999 letter to Nix to formalize his concerns because Nix was ignoring his complaints and that Hanna told Levingston that Nix was irritated with Levingston "because [he] was giving him so many cards and talking so much about the inhumane treatment of animals." The simple fact remains that within 17 days of having received Levingston's letter on May 24, 1999, Nix recommended that Levingston's employment be terminated.

It is true, as noted by the City, that Hanna's employment as a senior veterinarian was also terminated purportedly for the same reasons as Levingston's. However, Levingston did produce some evi-

dence that the City failed to adhere to established policies regarding the decision to terminate Levingston's employment and that he received discriminatory treatment in comparison to other employees who actually had abused animals. For example, Simmons testified that, in his 18 years of experience at BARC, he had never been asked to investigate animal abuse or neglect by BARC clinical staff or kennel attendants until Nix asked him to investigate the death of the female Rottweiler. He also testified that although he had found some evidence of animal abuse by three animal control officers in the past, none of the animal control officers had been indefinitely suspended.

Also, in his March 23, 2000 letter informing Levingston of his indefinite suspension, Mayor Brown, in addition to referencing Levingston's treatment of the Rottweiler and Great Dane, also noted that Levingston had been disciplined in 1994 and 1995 for "excessive absenteeism" and "negligence in routine assigned duties." Nix also referenced these matters in his June 10, 1999 letter recommending Levingston's indefinite suspension from BARC. The record reveals, however, that Kendrick testified that such previous disciplinary action could not, under established City policy, "be used as a basis for justification for future discipline unless done so in a timely fashion for a similar reason, or a similar or related violation." In fact, after Levingston had been disciplined for these matters, he received perfect-attendance awards from Kendrick and strong performance evaluations from Hanna while Nix was BARC's division manager. Yet, despite the City's policy, the Mayor, in his letter, noted that Kendrick "was left with no other alternative" but to recommend Levingston's indefinite suspension "[s]ince previous disciplinary actions have failed to correct his unacceptable behavior."

Finally, Levingston presented ample evidence from which the jury could have reasonably inferred that the City's stated reason for terminating Levingston's employment was a pretext. In addition to all of the above evidence, the record reveals that Kendrick decided to proceed with *Loudermill* hearings against Levingston and Hanna based on their alleged negligence as veterinarians, even though neither Nix nor Simmons nor she were veterinarians. Only after Kendrick had conducted Hanna's *Loudermill* hearing did the City hire a veterinarian to review the actions of Levingston and Hanna in regard to the Rottweiler and Great Dane.

The City hired Dr. DeWees, an individual with 18 months experience as a veterinarian. DeWees had never visited BARC and had no experience with working at a public pound or in a kennel. He also did not know the patient load at BARC or how many veterinarians worked there. His opinions that Levingston and Hanna were negligent in the treatment of the Rottweiler and Great Dane were based on "some reports that were essentially information that was handwritten information from the kennel attendants about who they notified about problems with certain animals." The City basically instructed DeWees to "just come down to the City library," where it had some documents for him to review to write his report. He did not visit with Hanna, Levingston, the veterinary technicians, or any of the kennel attendants before forming his opinions. Moreover, DeWees was not even aware of what equipment, instruments, and laboratory testing were available to the veterinarians at BARC. Although he was critical of Levingston for not having ordered a parvo test on the Rottweiler, DeWees did not even know that such a test was not available to BARC veterinarians. He also, in regard to the Great Dane, did not know that x-rays were not available to BARC

veterinarians. Under cross-examination, DeWees admitted that it could not have been negligence or malpractice for Levingston not to order the parvo test or x-rays. DeWees was also unaware of Levingston's assertion that he had in fact physically examined the Great Dane, and, had DeWees known this, he "wouldn't have found fault with not examining the animal." Moreover, concerning the euthanization of the Rottweiler, DeWees also admitted that he did not agree with BARC's written policy that "some degree of pain and suffering must be tolerated as necessary" to reunite a pet with its family.

The record reveals that even though DeWees based his criticisms of Levingston's treatment of the Rottweiler and the Great Dane in large part on Levingston's not ordering certain tests on the animals, Kendrick knew that those particular tests were not available at BARC. Even still, Kendrick recommended to Mayor Brown that Levingston's employment be terminated, and the Mayor, in his March 23, 1999 letter informing Levingston of his indefinite suspension from BARC, relied heavily on DeWees's report. Moreover, after Kendrick reported Levingston's treatment of both the Rottweiler and the Great Dane to the Texas State Board of Veterinary Examiners, the Board closed the case with "no violations found." From this evidence, the jury could have reasonably concluded that the City's stated reason for terminating Levingston's employment was in fact false.

The bottom line is that although the City presented evidence that Levingston was fired because of his treatment of the two dogs, Levingston presented substantial evidence to the contrary and, through cross-examination, brought the credibility of the City's witnesses into question. The jury, as the fact finder, had the opportunity to view the witnesses and was the sole judge of their credibility and the weight to give to their testimony. *Eberle v. Adams*, 73 S.W.3d 322, 327 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). Levingston presented evidence disputing the reason proffered by the City for the termination of his employment, and the jury was free to disbelieve the City's proffered reason. We hold that the evidence is legally sufficient to support the jury's findings that Levingston's reports of animal abuse to BARC was "a cause" of the City's terminating his employment when it did. *See City of Fort Worth v. Johnson*, 105 S.W.3d 154, 168 (Tex.App.-Waco 2003, no pet.) (finding legally sufficient circumstantial evidence to show causation when only one similarly situated employee was treated differently from plaintiff); *see also Tomhave v. Oaks Psychiatric Hosp.*, 82 S.W.3d 381, 386 (Tex.App.-Austin 2002, pet. denied) (explaining that timing in retaliatory discharge is important and that retaliatory discharge may be based on immediacy of termination following report), *overruled on other grounds by Binur v. Jacobo*, 135 S.W.3d 646 (Tex.2004). Accordingly, we further hold that the trial court did not err in denying the City's motion for judgment notwithstanding the verdict on this ground.

We overrule the City's second issue.

### Mental–Anguish Damages

■ In its third issue, the City argues that the evidence is legally insufficient to support any award of past or future mental-anguish damages to Dr. Levingston. In regard to Levingston's damages, the jury answered question number two of the charge, in pertinent part, as follows:

> What sum of money if paid now in cash would fairly and reasonably compensate Sam Levingston for his damages, if any, that resulted from [the City's] conduct?
> . . . .

c.) Compensatory damages suffered in the past.

Answer: $500,000.00

d.) Compensatory damages that [Levingston] will, in all reasonable probability, suffer in the future.

Answer: $375,000.00

In the instructions accompanying this question, the charge defined the term "compensatory damages" as including "pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary damages." As noted above, in its final judgment, the trial court reduced the amount of past and future compensatory damages awarded to Levingston from $875,000 to $250,000, in accordance with the statutory cap requirements of the Act. *See* TEX. GOV'T CODE ANN. § 554.003(c)(4) (Vernon 2004).

At the charge conference, the City did not object to the submission or to the wording of question number two, which listed generally several separate types of "compensatory damages" recoverable under the statute, including pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary damages. In its motion for new trial and on appeal, the City challenges the legal sufficiency of the evidence supporting an award of mental-anguish damages to Levingston, but does not challenge the sufficiency of the evidence supporting an award for the other types of damages included in the charge's definition of compensatory damages.

 The Texas Supreme Court has held that when a broad-form damages question commingles valid and invalid elements of damages and an appellant's objection is timely and specific, the resulting error is harmful, and a new trial is required when an appellate court cannot de-termine whether the jury based its verdict on an improperly submitted, invalid element of damage. *Harris County v. Smith*, 96 S.W.3d 230, 234 (Tex.2002). Here, however, the City did not object to the broad-form submission of the damages issue. Accordingly, because the City did not ask for separate damage findings, it can challenge only the legal sufficiency of the evidence supporting the entire award of damages. *See id.* at 232 (citing *Thomas v. Oldham*, 895 S.W.2d 352, 360 (Tex.1995)). Because the City does not make the argument that the evidence is insufficient to support the entire damage award, we must reject its evidentiary challenge. *Id.* (citing *Thomas*, 895 S.W.2d at 360). When damages issues are submitted in broad-form, it is difficult, if not impossible, to determine the amount that the jury awarded for each element of damages. As a result, to challenge a multi-element damage award on appeal successfully, a party must address all of the elements of damages and show that the evidence is insufficient to support the entire damage award. *G.T. Mngmt., Inc. v. Gonzalez*, 106 S.W.3d 880, 885 (Tex. App.-Dallas 2003, no pet.); *Norfolk S. Ry. Co. v. Bailey*, 92 S.W.3d 577, 583–84 (Tex. App.-Austin 2002, no pet.). Thus, the failure to address all the elements of the damage award results in a waiver of the sufficiency challenge. *Gonzalez*, 106 S.W.3d at 885; *Bailey*, 92 S.W.3d at 584.

Accordingly, because the City has challenged only the legal sufficiency of the evidence to support an award of mental-anguish damages to Levingston, and has not addressed the sufficiency of the evidence concerning the other elements of damages submitted to the jury in question number two, we hold that the City has waived appellate review of its sufficiency challenge.

We overrule the City's third issue.

## Award of Value of Reinstatement and Interest

In its fourth issue, the City argues that the trial court erred in awarding Dr. Levingston $235,000 as the economic value of reinstatement to his former position because "the Texas Whistleblower Act does not grant the value of future lost wages and reinstatement outside the statutory cap" on compensatory damages. Levingston counters that the statute "simply and plainly" provides for his mandatory reinstatement, and that, because the City contended that Levingston could not be reinstated, the trial court, as an alternative to reinstatement, appropriately awarded "front pay," or the "value of such reinstatement."

Here, the jury returned a verdict awarding Levingston $116,500 in past lost wages, $250,000 in future lost wages, $500,000 in past compensatory damages, and $375,000 in future compensatory damages. Levingston filed a proposed judgment, which included an award of the above amounts and an order reinstating him to his former position or an equivalent position, with all benefits and rights, within 10 days. The City filed a response to the proposed judgment, contending that Levingston was not entitled to reinstatement and stating that "it would not further the cause of justice" to return Levingston to his former position. Levingston filed a reply, again requesting reinstatement or, as an alternative to reinstatement, an award of "front pay" in the amount of $250,000, based on the jury's finding of future lost wages.[11] The parties then entered a stipulation that it was not feasible to reinstate Levingston. The trial court entered judgment awarding Levingston, among other things, the "value of reinstatement of [Levingston] to his former position or an equivalent position, fringe benefits and seniority rights lost

because of the termination" in the amount of $235,000. The trial court did not include in its judgment the jury's award of $250,000 for future lost wages.

### Reinstatement and Front Pay

■ Section 554.003 of the Texas Government Code provides that a public employee whose employment is suspended or terminated or who is subjected to an adverse personnel action in violation of section 554.002 "is entitled to sue" for

(1) injunctive relief;

(2) actual damages;

(3) court costs; and

(4) reasonable attorney fees.

Tex. Gov't Code Ann. § 554.003(a) (Vernon 2004).

In "*addition to relief* under Subsection (a)," the public employee "*is entitled*" to

(1) *reinstatement* to the employee's former position or an equivalent position;

(2) *compensation for wages lost during the period of suspension or termination;* and

(3) reinstatement of fringe benefits and seniority rights lost because of the suspension or termination.

*Id.* § 554.003(b) (Vernon 2004) (emphasis added).

Pursuant to the plain language of section 553.004(b), the City's duty to reinstate Levingston's employment was mandatory, and Dr. Levingston was entitled to reinstatement as a matter of law based on the jury's finding that Levingston's reports to BARC were a cause of the City's termination of his employment. *See City of Univ. Park v. Van Doren,* 65 S.W.3d 240, 252 (Tex.App.-Dallas 2001, pet. denied) (stating that similarly worded workers' compensation statute "is couched in man-

---

**11.** The issue of "future wages" was submitted to the jury without objection by the City.

datory language and contains no exceptions"). However, because the City objected to Levingston's reinstatement and the parties ultimately stipulated that it was not feasible to reinstate Levingston to his former position or an equivalent position, we must now determine whether the trial court was authorized to award Levingston the economic value of such reinstatement, commonly referred to by courts as "front pay," and whether this award was subject to the pertinent statutory cap.[12] *See* TEX. GOV'T CODE ANN. § 554.003(c) (Vernon 2004).

The concept of "front pay" is not novel, and Justice Clarence Thomas, writing for a unanimous Supreme Court, has explained that

> [f]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement. ... In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement.

*Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846, 121 S.Ct. 1946, 1948, 150 L.Ed.2d 62 (2001). The Supreme Court noted that courts have "recognized that reinstatement [is] not always a viable option, and that an award of front pay as a substitute for reinstatement in such cases [is] a necessary part of the 'make whole' relief mandated" in employment discrimination legislation and by the Supreme Court. *Id.*, 532 U.S. at 850, 121 S.Ct. at

1950. Thus, front pay is "awarded to compensate the plaintiff for future lost wages and benefits." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 489 n. 27 (5th Cir.2001); *see also Hansard v. Pepsi–Cola Metro. Bottling Co., Inc.*, 865 F.2d 1461, 1469 (5th Cir. 1989) (stating that " '[f]ront pay' refers to future lost earnings"). And, as noted by the Fifth Circuit Court of Appeals, while reinstatement is generally preferable to an award of front pay, a court may award front pay in lieu of reinstatement. *Giles*, 245 F.3d at 489 n. 27 (finding evidence sufficient to support lump-sum award of front pay under Americans with Disabilities Act); *cf. Hansard*, 865 F.2d at 1470 (finding award of front pay improper without preceding finding that reinstatement was not feasible).

Texas courts have also recognized the availability of an equitable award for front pay when reinstatement is not a feasible option. *United Servs. Auto. Ass'n v. Brite*, 161 S.W.3d 566, 573 (Tex.App.-San Antonio 2005, pet. granted) (affirming award of front pay under Texas Commission on Human Rights Act); *Wal–Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 45 (Tex.App.-Austin 1998, pet. denied) (same).

In *Pollard*, an employee brought a sexual-harassment claim against her employer under Title VII of the Civil Rights Act of 1964.[13] 532 U.S. at 845, 121 S.Ct. at 1948. The district court denied the employee's request for "front pay." *Id.*, 532 U.S. at 846–47, 121 S.Ct. at 1948. In determining whether the employee was entitled to an award of "front pay," the Supreme Court addressed section 706(g) of the Civil Rights Act, which authorized courts to "enjoin the respondent from engaging in such

---

**12.** The issue of whether a court is authorized to award "front pay" to a successful plaintiff under the Texas Whistleblower Act when reinstatement is not feasible is an issue of first impression. Thus, we look to analogous federal and state statutes, and case law interpreting those statutes, in determining the availability of this remedy.

**13.** 42 U.S.C.S. § 2000e (2005).

unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate." [14] *Id.*, 532 U.S. at 847–48, 121 S.Ct. at 1949. The Supreme Court confirmed the availability of front pay as an equitable remedy under the Civil Rights Act. *Id.*, 532 U.S. at 853–54, 121 S.Ct. at 1952.

In affirming the availability of front pay awards in lieu of reinstatement, the Supreme Court explained:

> We see no logical difference between front pay awards made when there eventually is reinstatement and those made when there is not. Moreover, to distinguish between the two cases would lead to the strange result that employees could receive front pay when reinstatement eventually is available but not when reinstatement is not an option—whether because of continuing hostility between the plaintiff and the employer or its workers, or because of the psychological injuries that the discrimination has caused the plaintiff. Thus, the most egregious offenders could be subject to the least sanctions.

*Id.*, 532 U.S. at 853, 121 S.Ct. at 1952.

Neither section 706(g) of the Civil Rights Act, addressed by the Supreme Court in *Pollard*, nor section 554.003 of the Texas Whistleblower Act, at issue in this case, expressly authorizes front pay. However, as noted above, section 706(g) authorizes a court to order, in addition to other remedies, "reinstatement or hiring of employees, with or without back pay, . . . or any other equitable relief as the court deems appropriate." 42 U.S.C.S. § 2000e–5(g)(1) (2005). Likewise, section

554.003(b) expressly states that, "in addition" to other statutorily authorized relief, including actual damages, an employee is entitled to reinstatement, *compensation for wages lost during the period of suspension or termination,* and reinstatement of fringe benefits and seniority rights. TEX. GOV'T CODE ANN. § 554.003(b).

Under the plain language of the section 554.003(b), Levingston was entitled to receive, in addition to actual damages, compensation for lost wages during the period of his indefinite suspension, including not only the period from the date of his suspension until the date of judgment, but also for any period of suspension that extended beyond the date of judgment. For example, if the parties had agreed that Levingston could not be reinstated until six months after the date of the judgment, Levingston would have been entitled to compensation, or "front pay," from the date of suspension until the future date of his reinstatement. Here, however, the City objected to Levingston's request for reinstatement, alleging that reinstatement was not an option. Levingston then entered into a stipulation that reinstatement was not feasible. Levingston should not be deprived of compensation for the period of his suspension simply because the City was either unwilling or unable to take him back. Thus, the *period of suspension or termination* for which Levingston would be entitled to compensation would necessarily include the time from the date of suspension until the date of judgment, and also some time period in the future. In light of the infeasibility of reinstating Levingston to his former position, we hold that the trial court did not err in awarding Levingston "front pay," or the economic value of his reinstatement, in lieu of reinstatement under section 554.003(b).

---

14. 42 U.S.C.S § 2000e–5(g)(1) (2005).

Accordingly, we must now determine whether such an award is subject to the statutory cap on compensatory damages in section 553.004(c). Again, we turn to the Supreme Court's opinion in *Pollard* for guidance. The court in *Pollard* noted that, in 1991, without amending section 706(g) of the Civil Rights Act, Congress expanded the remedies available in intentional employment discrimination cases by including compensatory and punitive damages, but limited the recovery of such damages by enacting various statutory damage caps.[15] 532 U.S. at 851, 121 S.Ct. at 1951. The cap in the Civil Rights Act states:

> The sum of the amount of *compensatory damages awarded under this section for future pecuniary losses,* emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party....

42 U.S.C.S. § 1981a(b)(3) (2000) (emphasis added).

The wording of the statutory cap on compensatory damages in section 554.003(c) of the Texas Whistleblower Act is substantially similar to that of the cap in the Civil Rights Act. The cap provision in the Texas Whistleblower Act states:

> [A] public employee may not recover *compensatory damages for future pecuniary losses,* emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses in an amount that exceeds....

TEX. GOV'T CODE ANN. § 554.003(c) (emphasis added).

In considering whether an award for front pay fell within the statutory cap in the Civil Rights Act, the Supreme Court

stated that, "[i]n the abstract, front pay could be considered compensation for 'future pecuniary losses,'" subject to the statutory cap on compensatory damages. *Pollard,* 532 U.S. at 852, 121 S.Ct. at 1951. However, the Court concluded that, in reading section 1981a as a whole, "the better interpretation is that front pay is not within the meaning of compensatory damages" and is excluded from the statutory cap. *Id.,* 532 U.S. at 852, 121 S.Ct. at 1951. Thus, the Supreme Court held that awards for front pay in lieu of reinstatement did not fall within the statutory cap on compensatory damages set forth in section 1981a. *Id.,* 532 U.S. at 852–53, 121 S.Ct. at 1951–52.

 In this case, Levingston was entitled to reinstatement, as well as compensation for wages lost during the period of his suspension. TEX. GOV'T CODE ANN. § 554.003(b). Because, as stipulated by the parties, reinstatement was not feasible, Levingston was entitled to receive front pay for the period of his suspension in lieu of his reinstatement. *See Pollard,* 532 U.S. at 852, 121 S.Ct. at 1951; *see also Brite,* 161 S.W.3d at 573; *Davis,* 979 S.W.2d at 45. In accord with the Supreme Court's decision in *Pollard,* we hold that an award for front pay in lieu of reinstatement is not subject to the statutory cap on compensatory damages in section 554.003(c) of the Texas Whistleblower Act. *See Giles,* 245 F.3d at 490 n. 28 (stating that majority of courts have concluded that front pay, as alternative to reinstatement, is "equitable in nature and therefore falls outside the statutory limitation of 'compensatory damages'").

### Interest

As part of its fourth issue, the City also argues that the trial court further erred

---

**15.** 42 U.S.C.S. § 1981a(a)(1) (2000).

in awarding Levingston prejudgment interest on the award of past lost wages and compensatory damages, which totaled $365,500, because "the Act does not authorize prejudgment interest on compensatory damages over and above the [$250,000] statutory cap" and because "prejudgment interest falls within the elements of a plaintiff's damages subject to the statutory cap." Here, the trial court awarded Levingston lost wages from termination through trial (i.e. past lost wages) in the amount of $116,500, "[c]ompensatory damages *capped* at the amount of $250,000," and "prejudgment interest on the amount of $365,500." (emphasis added).[16]

■ An employee who successfully sues under section 554.003 is entitled to recover prejudgment interest on awards of lost wages and actual damages. *See Catron*, 83 S.W.3d at 273–74; *Robertson County v. Wymola*, 17 S.W.3d 334, 343–44 (Tex.App.-Austin 2000, pet. denied). The applicable statutory cap prohibits an employee from recovering "compensatory damages for *future pecuniary losses*, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" in excess of certain amounts. Tex. Gov't Code Ann. § 554.003(c) (emphasis added). By its plain terms, the statutory cap does not apply to amounts awarded for past lost wages and compensatory damages for past pecuniary losses and, thus, we will not apply the statutory cap to prejudgment interest accrued on these amounts.[17] Thus, we hold that Levingston was entitled to an award of prejudgment interest on the trial court's award of $116,500 for past lost wages.

■ The award of prejudgment interest on the underlying award of $250,000 for "compensatory damages" presents a more difficult issue because it is based on a jury award of $500,000 for "compensatory damages [ ] in the past" and $375,000 for "compensatory damages ... in the future." Because the charge defined "compensatory damages" to include "pecuniary losses," the jury's award of $500,000 for past compensatory damages could have included an amount for past pecuniary losses, which would not be subject to the cap; therefore, any prejudgment interest earned on past pecuniary losses would also not be subject to the cap. However, we

---

**16.** It appears that the trial court made a calculation error, and that the trial court likely intended to award prejudgment interest on the amount of $366,500, the total award of past lost wages and compensatory damages, instead of $365,500. However, neither party raises this issue, and we need not address it. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993).

**17.** Citing *Columbia Hosp. Corp. of Houston v. Moore*, 92 S.W.3d 470, 474 (Tex.2002), the City asserts that "[a] legion of cases have held, with other statutory caps, that prejudgment interest on damages is itself 'damages' included within the statutory cap on damages." However, in all the cases cited by the City, the prejudgment interest that was included within the capped damage amounts was earned on underlying amounts that were

also subject to the cap. For example, in *Columbia Hosp. Corp. of Houston*, in addressing the statutory damage cap in the former Medical Liability and Insurance Improvement Act, the Texas Supreme Court concluded that prejudgment interest earned on capped damages "remain[ed] a form of the compensatory damages capped by subchapter K." *Id.* The Court further stated that "prejudgment interest on past damages excluded from the cap ... is fully available, but prejudgment interest on damages subject to the cap may be awarded only up to [the] cap amount." *Id.* Here, the cap does not apply to amounts awarded for past lost wages and compensatory damages for past pecuniary losses, and there is no authority for the proposition that prejudgment interest earned on these underlying uncapped awards would be subject to the cap.

note that the trial court separately awarded Levingston past lost wages, which likely accounted for the pecuniary losses Levingston sustained in the past.

■ Additionally, the trial court, in its judgment, combined the jury's compensatory damages awards for a total award of "compensatory damages *capped* at the amount of $250,000." To the extent that the jury, in its award of past compensatory damages, included an amount for past pecuniary losses (above and beyond its separate award for Levingston's past lost wages), Levingston would have been entitled to this award in addition to his capped damages. Yet, the trial court did not make any such award and instead only awarded "capped compensatory damages." Consequently, any prejudgment interest earned on these capped amounts was necessarily subject to the cap. *See Columbia Hosp. Corp. of Houston v. Moore*, 92 S.W.3d 470, 474 (Tex.2002) (holding prejudgment interest on damages subject to cap in former Medical Liability and Insurance Improvement Act may be awarded only up to cap amount). Finally, we note that a plaintiff seeking prejudgment interest bears the burden of segregating the damages on which he is entitled to such interest. *See Domingues v. City of San Antonio*, 985 S.W.2d 505, 511 (Tex.App.-San Antonio 1998, pet. denied). Here, the charge permitted the jury to award, in its figure for past compensatory damages, both capped and uncapped damages, and the trial court's judgment contained a single award of $250,000 for capped compensatory damages. Thus, we hold that Levingston was not entitled to prejudgment interest on the award of $250,000 in capped compensatory damages.

We sustain the City's fourth issue in part and overrule the City's fourth issue in part. We modify the trial court's judgment to provide for the award of prejudgment interest on the amount of $116,500 rather than on the amount of $365,500.

## Attorneys' Fees

■ In its fifth issue, the City argues that the trial court erred in applying a "multiplier" in calculating the award of Levingston's attorneys' fees. We review a trial court's award of attorneys' fees for an abuse of discretion. *Twin City Fire Ins. Co. v. Jones*, 834 S.W.2d 114, 116 (Tex. App.-Houston [1st Dist.] 1992, writ denied). A trial court abuses its discretion only when it acts in an unreasonable and arbitrary manner or when it acts without reference to any guiding rules or principles. *Standard Constructors, Inc. v. Chevron Chem. Co.*, 101 S.W.3d 619, 626 (Tex. App.-Houston [1st Dist.] 2003, pet. denied).

Here, following the trial, Levingston's attorneys submitted affidavits and documentary evidence to the trial court, indicating that they had represented Levingston on a contingent-fee basis and had spent 757.3 hours representing him in this matter. His counsel sought reimbursement for this time at a rate of $225 per hour, for a total of $170,392.50. In addition, Levingston's attorneys sought an "enhanced" amount of attorneys' fees, based upon the various factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), in the amount of $396,450. In its final judgment, the trial court awarded Levingston $194,107.50 in attorneys' fees—$23,715 more than the "lodestar" [18] amount submitted by Levingston's counsel.

---

**18.** "Lodestar" is defined as "a reasonable amount of attorneys' fees in a given case, usually calculated by multiplying a reasonable number of hours worked by the prevailing hourly rate in the community for similar work, and often considering such additional factors as the degree of skill and difficulty involved in the cease, the degree of its urgen-

 As a prevailing plaintiff in a Whistleblower suit, Levingston was entitled to the recovery of his reasonable attorneys' fees. *See* Tex. Gov't Code Ann. § 554.003(a)(4) (Vernon 2004); *see also Catron*, 83 S.W.3d at 272–73. To calculate reasonable attorneys' fees, an attorney should multiply the number of hours worked by the hourly rate. *Guity v. C.C.I. Enter. Co.*, 54 S.W.3d 526, 528 (Tex.App.-Houston [1st Dist.] 2001, no pet). The number of hours and the hourly rate must be reasonable. *Id.* at 528–29. After calculating the lodestar amount, a trial court can adjust the lodestar amount upward to account for the well-established *Johnson* factors. *Id.* (citing *Johnson*, 488 F.2d 714, 717–19). The *Johnson* factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required; (4) the effect on other employment by the attorney; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the attorneys' relationship with the client; and (12) awards in similar cases. *Id.* at 529. If some of these factors are accounted for in the lodestar amount, they should not be considered when making adjustments. *Id.*

 Rather than challenge the affidavit and documentary evidence offered by Levingston's attorneys in support of the reasonableness of their fees and the enhancement of the lodestar amount, the City simply argues that any award of attorneys' fees greater than the lodestar amount of $170,392.50 is "clearly uncalled for" and "neither reasonable nor necessary." However, Levingston's attorneys presented evidence that the case involved substantial discovery, was tried over more than two weeks, and involved numerous fact and expert witnesses, voluminous documentary evidence, and complicated legal issues. The evidence in the record supports the trial court's award of attorneys' fees, based on the amount of work that Levingston's attorneys performed on the case, their experience, and the case's complexity.

Accordingly, we hold that the trial court did not abuse its discretion in awarding Dr. Levingston $194,107.50 in attorneys' fees.

We overrule the City's fifth issue.

### Jury Question on City's Affirmative Defense

 In its sixth issue, the City argues that the trial court erred in refusing to submit, in a separate question in the jury charge, the City's statutory affirmative defense to Dr. Levingston's suit under the Act. We review jury-charge error under an abuse of discretion standard. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). In preparing the charge, trial courts have no discretion to misstate the law. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex.2002).

An employing governmental entity may raise, as an affirmative defense to a suit under the Act, the fact that it "would have taken the action against the employee that forms the basis of the suit based solely on information, observation, or evidence that is not related to the fact that the employee made a report protected under this chapter of a violation of law." Tex. Gov't Code Ann. § 554.004(b) (Vernon 2004).

Here, the trial court did not include a separate question concerning the affirma-

cy, its novelty, and the like." Black's Law Dictionary 952 (7th ed.1999).

tive defense in section 554.004(b) in the jury charge, but included a similarly worded instruction accompanying question number one, which read, in pertinent part:

> Were Sam Levingston's reports to BARC, if any, ... made in good faith and a cause of the City of Houston's terminating his employment when it did?
>
> ....
>
> [Levingston's] reports were not a cause if the City of Houston would have terminated him based solely on information, observation, or evidence that is not related to the fact that he made the reports.

The City does not dispute that the language included by the trial court in its instructions properly tracked that of section 554.004(b). Rather, the City asserts that the trial court erred in including the City's affirmative defense "obliquely in the instructions only," rather than as a separate question. The City urges this Court to find reversible error in the trial court's refusal to submit the affirmative defense as a separate question because the City "established that it terminated Levingston based on information and observation not related to his alleged reports."

■ Our sister court recently noted that, although section 554.004(b) has been labeled as an "affirmative defense," proof under this section actually negates the causation element of a plaintiff's cause of action. *Harris County v. Vernagallo*, 181 S.W.3d 17, 23 n. 12 (Tex.App.-Houston [14th Dist.] 2005, pet. filed). This is because, under the statute, proof that the employer would have made the same decisions solely because of a reason unrelated to the employee's protected report negates an essential element of the plaintiff's cause of action, namely, that the report was a cause of the adverse employment action.

*Id.* "If the plaintiff was fired solely for a reason unrelated to his report of illegal activity, then his report could not have been a cause of his termination." *Id.* Conversely, "if the report was a cause of his termination, the plaintiff could not have been fired solely because of an unrelated reason." *Id.* Had the trial court placed the affirmative defense in a separate question, the jury could have been confused and provided conflicting answers to both questions. Thus, we hold that the trial court did not err in providing a jury instruction, rather than a separate question, that tracked the language of section 554.004(b). Additionally, we have previously held that there was legally sufficient evidence to support the jury's finding that Levingston's reports were a cause of the City's termination of his employment when it did, and, necessarily, the jury must have determined that Levingston could not have been fired "solely because of an unrelated reason." Thus, even assuming that the trial court erred in submitting the affirmative defense in section 554.004(b) as an instruction rather than as a separate question, such error was harmless. *See* Tex. R.App. P. 44.1.

We overrule the City's sixth issue.

### Motion to Strike Request for Jury Trial

■ In its seventh issue, the City argues that the trial court erred in denying the City's motion to strike Dr. Levingston's request for a jury trial because, although Levingston had paid a jury fee, he failed to make a written jury demand more than 30 days before trial. *See* Tex.R. Civ. P. 216.

The record indicates that, although Levingston paid a jury fee, he did not file a written jury demand as required by Rule 216.[19] *See* Tex.R. Civ. P. 216. However,

---

**19.** We note that the opening paragraph of

Levingston's original petition recites that "for

Levingston notes, and the City does not contest, that, at the parties' pretrial conference, the trial court denied the City's motion to strike Levingston's request for a jury trial subject to the City's being given adequate time to prepare for a jury trial. Rather than request a continuance, the City announced that it was ready for trial, which began the following day.

The City argues that a jury trial impeded the ordinary handling of the court's business and that a bench trial would have been easier and promoted judicial economy. However, the City has not cited any evidence to show that it was injured or otherwise prejudiced by having to try the case to a jury or that such jury trial caused undue disruption to the trial court. *See Halsell v. Dehoyos,* 810 S.W.2d 371, 371 (Tex.1991). Moreover, an untimely request for a jury trial will become timely when the trial is reset to a date more than 30 days after the request. *Id.* Here, the trial court offered the City additional time to prepare for a jury trial, which the City refused. Accordingly, even assuming that the trial court erred in denying the City's motion to strike Levingston's request for a jury trial, we hold that any such error was harmless. *See* TEX.R.APP. P. 44.1(a)(1).

We overrule the City's seventh issue.

### Conclusion

We modify the trial court's judgment to provide for the award of prejudgment interest on the amount of $116,500 rather than on the amount of $365,500. We affirm the judgment of the trial court in all other respects.

cause of action [he] would respectfully show unto this Honorable Court and Jury as follows.…" We also note that the record does not indicate that the case was ever set for trial to the bench.